United States Court of Appeals,

Fifth Circuit.

No. 91-6066.

Jesse Joseph DETERS, Petitioner-Appellant,

v.

James A. COLLINS, Director, Texas Dept. of Criminal Justice Institution Division, Respondent-Appellee.

March 11, 1993.

Appeal from the United States District Court for the Southern District of Texas.

Before JOHNSON, GARWOOD, and JONES, Circuit Judges.

JOHNSON, Circuit Judge:

Jesse Joseph Deters, proceeding *pro se,* asks the Court to reverse the district court's decision not to issue a writ of habeas corpus. Deters presented a number of federal and state claims in his petition. However, finding that he failed to exhaust state remedies available to him, the Court declines to review the merits of this case and remands to the district court for dismissal without prejudice.

I. Facts and Procedural History

In August of 1973, a Texas jury convicted petitioner Deters of murder with malice aforethought in the Second Ninth Judicial District Court, which is located in Montgomery County, Texas. Deters was sentenced to imprisonment for ninety-nine years and one day. Although Deters' attorney properly provided notice of appeal in open court and requested the preparation of the statement of facts and exhibits for appeal, he apparently failed to do anything more, jeopardizing Deters' right to appeal.

Recognizing that something was amiss, Deters filed a petition for habeas corpus in the United States District Court for the Eastern District of Texas three years later, on November 15, 1976.[1] On

---

[1]Deters presented several issues in the federal district court. He claimed there, as he has consistently claimed since that time, that 1) his confession was coerced by State officials who beat him, 2) the State violated his privilege against self-incrimination, 3) his waiver of rights and his confession were not taken in accordance with state law, 4) the State refused to timely provide an

August 21, 1978, the district court dismissed Deters' petition based upon his failure to exhaust state remedies.[2] Accordingly, Deters filed a petition for habeas corpus in the state trial court on March 23, 1979. After that court failed to timely respond to Deters' petition, Deters, on May 2, 1979, filed a petition for a writ of mandamus in Texas' highest criminal court, the Court of Criminal Appeals. The Court of Criminal Appeals issued a *per curiam* opinion on May 23 of that year ordering the state trial court to hold an evidentiary hearing to, among other things, "investigate and determine any and all further facts relevant to the disposition of [Deters'] application for writ of habeas corpus."

The state trial court held hearings on August 1 and August 9, 1979; however, it limited the hearings to only one of Deters' complaints—whether he had been denied the right to appeal.[3] The trial court, in a September 13, 1979, memorandum, expressed its findings of facts and concluded that Deters should be given an out-of-time appeal. The Court of Criminal Appeals ordered such an appeal in a memorandum dated October 10, and on October 17, 1979, Deters filed his second notice of appeal in the Second Ninth Judicial District Court of Texas. The following day, however, Deters volunteered to serve the remainder of his state sentence in a federal prison. Retaining the right to return to the state system, which he could exercise one time, Deters was removed to the federal prison in Leavenworth, Kansas.

Appealing *pro se,* Deters corresponded with officials in the state district court from November 1979 through April 1980 about the records of his 1973 trial. After learning that the court reporter

---

attorney after he requested one, 5) his jury was biased, and the State trial judge erroneously denied him a change of venue, and 6) his sentence was not authorized by the Texas penal code.

> We note that not all of these issues are cognizable in the federal forum. When reviewing applications for habeas corpus, federal courts will only review allegations of deprivations of federal rights. 28 U.S.C. § 2254(a) (providing that federal courts "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court *only* on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States" (emphasis added)).

[2]Prior to the issuance of the district court's decision, Deters filed a petition for a writ of mandamus in this Court because of the district court's lengthy delay in reviewing his case.

[3]On August 19, Deters filed a second petition for a writ of mandamus in the Court of Criminal Appeals. This time he asked the court to compel the trial court to investigate the other issues which he had raised in his habeas corpus petition.

no longer possessed her shorthand notes from the trial and was thus unable to prepare a statement of facts therefrom, Deters informed the state court that the statement of facts was not available.[4] In January of 1980, Deters' court-appointed attorney discovered that the exhibits—the real evidence admitted during the trial—had either been destroyed or lost. Consequently, Deters submitted objections to the record in the state trial court and requested the opportunity to review the record. He later received a copy of the transcript, and on March 26, 1980, he sent supplemental objections to the trial court. After learning that no hearing had been set to review his motions and objections, Deters filed yet a third petition for a writ of mandamus in the Court of Criminal Appeals. In that petition, dated April 22, 1980, Deters claimed that the trial court was obstructing his right to appeal by failing to set a hearing date to review his objections to the record. The court refused to issue the writ.

The state trial court later scheduled the hearing for September 26, 1980. Prior to that hearing, Deters filed a motion requesting that he, Deters, be present at the hearing and act as his own counsel. However, because Deters was not in Texas' custody, the Texas trial judge refused to expend Texas or Montgomery County funds to transport Deters from Kansas for the hearing since he had voluntarily placed himself in federal custody.[5] In a December 12, 1980, order, the court indefinitely postponed the hearing, stating that "[w]hen [Deters] voluntarily presents himself, a hearing will be set to consider his objections to the appellate record." The following January, Deters filed a habeas corpus petition in the Court of Criminal Appeals, alleging the denial of his right to appeal. In

---

[4]In reality, the statement of facts, though incomplete, was available. Upon notifying the state court of his appeal in 1973, Deters' first attorney obtained the statement of facts. This attorney later gave the documents to Deters, and Deters brought them with him to the August 1, 1979, hearing. The State claimed that the documents were the originals and took them from Deters.

By all accounts, the statement of facts is uncertified and incomplete. It does not include *voir dire,* the closing arguments during the guilt/innocence stage, or the testimony and closing arguments from the sentencing stage. Deters claims that other parts of the record—namely testimony from the change of venue hearing, the jury instructions, and questions asked by the jury during deliberations—are also absent.

[5]In a September 26, 1980, order, the court noted that the order which transferred Deters to federal custody provided a method by which he could return to Texas. The court was no doubt referring to the one-time option afforded Deters which allowed him to return to the Texas prison system.

September of the same year, that court declined to grant the writ because the appeal was still pending.

Indeed, as far as this Court knows, that appeal is *still* pending.[6] Since 1981, Deters has done little, if anything, to speed along his appeal, although he has had ample opportunity to do so. In January of 1984, he was released from prison on parole. While released, Deters did not communicate with the Second Ninth Judicial District Court, let alone enter that court's jurisdiction for the record certification hearing.

Due to his conviction of a felony in Louisiana in March of 1986,[7] Texas revoked his parole in January of 1987. Less than a month before the revocation of his parole, Deters wrote to the Court of Criminal Appeals about the status of his pending appeal. That court suggested that Deters file a petition for a writ of mandamus so as to speed along the appeal. Deters rejected that advice and instead filed this habeas corpus petition in the United States District Court for the Eastern District of Texas. That court, determining that it was without jurisdiction to decide the case, transferred the case to the Southern District of Texas.

Although that federal district court recognized that Deters had failed to exhaust state remedies, it excused the exhaustion requirement. The district court, adopting the memorandum and recommendation of the magistrate, determined that exhaustion was not required because of the significant time lapse between Deters' 1973 trial and his petition for habeas corpus. Reaching the merits of the case, the federal district court declined to hold that Deters' constitutional rights had been violated and accordingly refused to issue a writ of habeas corpus. Deters appealed to this Court, asserting that the federal district court had properly decided the exhaustion issue. However, he urges this Court to reverse on the merits of his case.

## II. Discussion

A. *History of Habeas Corpus*

---

[6]After Deters filed this habeas corpus application in the federal district court of the Eastern District of Texas, the Montgomery County District Clerk averred that Deters' appeal was still pending pursuant to the state district court's September 26, and December 12, 1980, orders.

[7]He was sentenced to incarceration for 99 years.

Considered the most important of all writs,[8] the *habeas corpus ad subjiciendum*—the Great Writ—is established upon the goal of protecting individual liberty interests from governmental oppression. *Fay,* 372 U.S. at 400-01, 83 S.Ct. at 828. Its root principle is that neither men nor women should suffer illegal imprisonment. Indeed, although the definition of illegal imprisonment has changed since the inception of habeas corpus jurisprudence, the purpose of the writ has not changed since its birth in the sixteenth century.

Deploring the frequent violations of the "great Charter and auncient good Lawes and statutes of this realme," a member of the House of Commons introduced a bill in that legislative body in 1593 which provided:

> That the provisions and prohibicions of the said great Charter and other Lawes in that behalfe made be dulie and inviolatelie observed. And that no person or persons be hereafter committed to prison but yt be by sufficient warrant and Authorities and by due course and proceedings in Lawe....
>
> And that the Justice of anie the Queenes Majesties Courts of Recorde at the common Lawe maie awarde a writt of habeas Corpus for the deliverye of anye person so imprisoned.[9]

By 1670 the habeas corpus doctrine had so thoroughly permeated the English courts that the Chief Justice of the Common pleas asserted that "[t]he writ of habeas corpus is now the most usual remedy by which a man is restored again to his liberty, if he have been against law deprived of it." *Preiser v. Rodriguez,* 411 U.S. 475, 484-85, 93 S.Ct. 1827, 1833, 36 L.Ed.2d 439 (1973), *overruled by Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (quoting *Bushell's Case,* Vaughan 135-36, 124 Eng.Rep. 1006, 1007).

Indeed, by the time American settlers achieved independence from England, the use of writs of habeas corpus to release illegally detained prisoners was deeply rooted in the American jural heritage. *Id.* 411 U.S. at 485, 93 S.Ct. at 1833. So important was the doctrine of habeas corpus that

---

[8]The term "habeas corpus," as used today, actually refers to the *habeas corpus ad subjiciendum,* which is only one of several types of habeas corpus. *See* BLACK'S LAW DICTIONARY 709-10 (6th ed. 1990). *See also Fay v. Noia,* 372 U.S. 391, 399 n. 5, 83 S.Ct. 822, 827 n. 5, 9 L.Ed.2d 837 (1963), *overruled by Coleman v. Thompson,* --- U.S. ----, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

[9]*Fay v. Noia,* 372 U.S. at 402, 83 S.Ct. at 829 (quoting Walker, *The Constitutional and Legal Development of Habeas Corpus as the Writ of Liberty* 44-45 (1960)).

the founding fathers saw fit to ensure that the privilege of habeas corpus relief would never die: They placed the doctrine in the Constitution of the United States.[10] Indeed, the first congressional grant of jurisdiction provided federal courts authority to grant writs of habeas corpus, and by 1807, the United States Supreme Court recognized that such a writ was "a great constitutional privilege." *Preiser,* 411 U.S. at 485, 93 S.Ct. at 1833 (quoting *Ex parte Bollman,* 8 U.S. (4 Cranch) 75, 95, 2 L.Ed. 554 (1807)).[11]

*B. Exhaustion Doctrine*

1. Background

Although the habeas corpus doctrine has significant importance in the jurisprudence in this nation, the grant of such a writ is not without limitations. For well over a century, federal law has recognized that the ideals of federal-state comity demand that federal courts at least pause prior to invalidating state court decisions and releasing those whom state courts have convicted. *See Ex Parte Royall,* 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886). In *Ex Parte Royall,* the United States Supreme Court, while recognizing that federal courts have the jurisdictional power to discharge a state prisoner, determined that such courts are "not bound in every case to exercise such a power immediately upon application being made for the writ." *Id.* at 251, 6 S.Ct. at 740. Justice Harlan, writing for the Court, explained:

> That discretion [to issue a writ of habeas corpus] should be exercised in the light of the relations existing, under our system of government, between the judicial tribunals of the Union and of the states, and in recognition of the fact that the public good requires that those relations be not disturbed by unnecessary conflict between courts equally bound to guard and protect rights secured by the [C]onstitution.

*Id.* From the pages of *Ex Parte Royall* sprang forth the doctrine of exhaustion.[12] Codified in 1948,

---

[10]Article I provides, "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it. U.S.CONST. art. I, § 9, cl. 2.

[11]*See Fay v. Noia,* 372 U.S. at 399-415, 83 S.Ct. at 827-836, for an extensive history of the Great Writ.

[12]Exhaustion is not a jurisdictional issue. It is simply a doctrine based upon comity. *Granberry v. Greer,* 481 U.S. 129, 131, 107 S.Ct. 1671, 1673, 95 L.Ed.2d 119 (1987); *Fay,* 372 U.S. at 426, 83 S.Ct. at 842; *Ex parte Royall,* 117 U.S. at 248-250, 6 S.Ct. at 738-739.

that doctrine now statutorily forbids a federal court from granting a writ of habeas corpus to a state applicant unless that applicant has exhausted state juridical remedies or unless the state's corrective process is incapable of protecting the rights of the applicant.[13]

The exhaustion doctrine is grounded upon several pragmatic considerations. First, federal courts have long recognized that state courts have concurrent jurisdiction and equivalent responsibility with federal courts to protect federal rights. *Duckworth v. Serrano,* 454 U.S. 1, 3, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981); *Carter v. Estelle,* 677 F.2d 427, 445 (5th Cir.1982), *cert. denied,* 460 U.S. 1056, 103 S.Ct. 1508, 75 L.Ed.2d 937 (1983); *Ex parte Royall,* 117 U.S. at 251, 6 S.Ct. at 740. Moreover, if, as in this case, an issue rests upon unresolved questions of fact or of state law,[14] comity and judicial efficiency may require federal courts to insist on complete exhaustion to ensure that the court has a complete record to review. *Granberry,* 481 U.S. at 135, 107 S.Ct. at 1675; *Rose,* 455 U.S. at 519, 102 S.Ct. at 1203. Further, absent the exhaustion doctrine, state courts may become isolated from federal law, enervating their need to develop and enforce such law. *Castille v. Peoples,* 489 U.S. 346, 348, 109 S.Ct. 1056, 1059, 103 L.Ed.2d 380 (1989); *Rose,* 455 U.S. at 518, 102 S.Ct. at 1203; *Galtieri v. Wainwright,* 582 F.2d 348, 353 (5th Cir.1978).

However, the most dominant and important concern of exhaustion is that of comity: State

---

[13]Section 2254 reads in part:

> (b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

> (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

28 U.S.C. § 2254(b)-(c). For a history of section 2254, see *Rose v. Lundy,* 455 U.S. 509, 517 n. 10, 102 S.Ct. 1198, 1203 n. 10, 71 L.Ed.2d 379 (1982); Charles A. Wright et al., *Federal Practice and Procedure* § 4264 (1988).

[14]Not only is there no certified record in this case, but significant parts of the record are missing. For example, Deters claims that jury bias violated his due process rights; however, no transcript of *voir dire* or the hearing on his motion to transfer venue exists.

courts should have the first opportunity to make right their mistakes. *Vasquez v. Hillery,* 474 U.S. 254, 257, 106 S.Ct. 617, 620, 88 L.Ed.2d 598 (1986); *Duckworth v. Serrano,* 454 U.S. 1, 3, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981); *Rose,* 455 U.S. at 516, 102 S.Ct. at 1202; *Preiser,* 411 U.S. at 492, 93 S.Ct. at 1837; *Picard v. Connor,* 404 U.S. 270, 276, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); *Wilwording v. Swenson,* 404 U.S. 249, 252, 92 S.Ct. 407, 409, 30 L.Ed.2d 418 (1971); *Carter,* 677 F.2d at 441. *See Justices of Boston Municipal Court v. Lydon,* 466 U.S. 294, 333-34, 104 S.Ct. 1805, 1826, 80 L.Ed.2d 311 (1984) (Stevens, J. concurring) (asserting that "[t]he disruption of orderly state processes attendant to the exercise of federal habeas jurisdiction when state proceedings remain pending weighs strongly, and in my view decisively, against the exercise of jurisdiction"). *See also* Note, *Developments in the Law—Federal Habeas Corpus,* 83 Harvard Law Review 1038, 1093 (1970). Indeed, "*[o]nly* if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas corpus proceeding does it make sense to speak of the exhaustion of state remedies." *Picard,* 404 U.S. at 276, 92 S.Ct. at 512 (emphasis added). The Supreme Court elucidated in *Rose v. Lundy:*

> Because "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation," federal courts apply the doctrine of comity, which "teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter."

*Rose,* 455 U.S. at 518, 102 S.Ct. at 1203 (quoting *Darr v. Burford,* 339 U.S. 200, 204, 70 S.Ct. 587, 590, 94 L.Ed. 761 (1950)). *See also Duckworth,* 454 U.S. at 3, 102 S.Ct. at 19 (asserting that "[t]he exhaustion requirement ... serves to minimize friction between our federal and state systems of justice by allowing the State an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights").

2. Requirements and Exceptions

a. Requirements

The requirements of the exhaustion concept are simple: An applicant must fairly apprise the highest court of his state of the federal rights which were allegedly violated. *Picard,* 404 U.S. at 275, 92 S.Ct. at 512; *Carter,* 677 F.2d at 443; *Galtieri,* 582 F.2d at 353. Further, the applicant must

present his claims in a procedurally correct manner. *Carter,* 677 F.2d at 443. If, for whatever reason, an applicant bypasses the appellate processes of his state—whether through procedural default or otherwise—he will not be deemed to have met the exhaustion requirement absent a showing of one of two particulars. He must either demonstrate cause and prejudice or show that the failure to consider his claims will "result in a fundamental miscarriage of justice." *Coleman v. Thompson,* --- U.S. ----, ----, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991).

### b. Exceptions

The exhaustion requirement is excused only in those "rare cases where exceptional circumstances of peculiar urgency" mandate federal court interference. *Ex Parte Hawk,* 321 U.S. 114, 118, 64 S.Ct. 448, 450, 88 L.Ed. 572 (1944) (quoting *United States ex rel. Kennedy v. Tyler,* 269 U.S. 13, 17, 46 S.Ct. 1, 2, 70 L.Ed. 138 (1925)). *See also Irvin v. Dowd,* 359 U.S. 394, 405, 79 S.Ct. 825, 831, 3 L.Ed.2d 900 (1959). Based upon section 2254, if a state fails to satisfactorily protect a prisoner's right to review, federal courts are allowed to bypass the exhaustion requirement, for the exhaustion doctrine assumes that state remedies are adequate and available.[15] *Rose,* 455 U.S. at 515 n. 7, 102 S.Ct. at 1201 n. 7; *Duckworth,* 454 U.S. at 3, 102 S.Ct. at 19; *Preiser,* 411 U.S. at 493, 93 S.Ct. at 1838; *Young v. Ragen,* 337 U.S. 235, 238-39, 69 S.Ct. 1073, 1074, 93 L.Ed. 1333 (1949).

"Exceptional circumstances of peculiar urgency" exist in several circumstances.[16] Most

---

[15]In *Marino v. Ragen,* Justice Rutledge averred:

> The exhaustion-of-state-remedies rule should not be stretched to the absurdity of requiring the exhaustion of ... separate remedies when at the outset a petitioner cannot intelligently select the proper way [to exhaust state remedies], and [when] in conclusion he may find only that none of the [methods] is appropriate or effective.

*Marino v. Ragen,* 332 U.S. 561, 568, 68 S.Ct. 240, 244, 92 L.Ed. 170 (1947) (Rutledge, J. concurring).

[16]If seeking state remedies would be futile, the exhaustion requirement is excused. *Layton v. Carson,* 479 F.2d 1275, 1276 (5th Cir.1973) (deciding that when the highest state court has recently decided a federal issue contrary to the applicant's position, review in the state system is futile). Similarly, an applicant is not required to repetitively seek relief in state courts after the highest court in the state has reviewed his case. *Humphrey v. Cady,* 405 U.S. 504, 516 n. 18, 92 S.Ct. 1048, 1055 n. 18, 31 L.Ed.2d 394 (1972); *Wilwording v. Swenson,* 404 U.S. 249, 251, 92

importantly for our purposes, the exhaustion doctrine will not be applied when the state system inordinately and unjustifiably delays review of a petitioner's claims so as to impinge upon his due process rights. *Shelton v. Heard,* 696 F.2d 1127, 1128-29 (5th Cir.1983); *Carter,* 677 F.2d at 446; *Breazeale v. Bradley,* 582 F.2d 5, 6 (5th Cir.1978); *Rheuark v. Wade,* 540 F.2d 1282, 1283 (5th Cir.1976); *St. Jules v. Beto,* 462 F.2d 1365, 1366 (5th Cir.1972); *Reynolds v. Wainwright,* 460 F.2d 1026, 1027 (5th Cir.), *cert. denied,* 409 U.S. 950, 93 S.Ct. 294, 34 L.Ed.2d 221 (1972); *Dixon v. Florida,* 388 F.2d 424, 425 (5th Cir.1968). In analyzing exhaustion in each case, however, courts are to excuse noncompliance with the exhaustion doctrine *only* if the inordinate delay is wholly and completely the fault of the state. *See Carter,* 677 F.2d at 443, 445; *Brown v. Estelle,* 530 F.2d 1280, 1284 (5th Cir.1976); *Perry v. Jones,* 437 F.2d 758, 759 (5th Cir.1971). Petitioners without clean hands—those who contribute to the excessive delay—will not be heard to complain of the delay they have caused and thus will not be excused from meeting the exhaustion doctrine. *See e.g. Perry,* 437 F.2d at 759; *United States ex rel. Cash v. Brierley,* 412 F.2d 296, 297 (3d Cir.1969); *Barksdale v. Crouse,* 360 F.2d 34, 35 (10th Cir.1966); *United States ex rel. Long v. Rundle,* 331 F.Supp. 211, 212 (E.D.Pa.1971).

*C. The Rule in Deters' Case*

In this case, Deters alleges that the State of Texas has intentionally engaged in delay tactics which are expressly designed to deny him due process of law. Resting his exhaustion argument on the inordinate-delay exception, he urges this Court excuse his noncompliance with the exhaustion requirements. Deters asks the Court to find that, because the trial court refused to expend state or county funds to pay for his transportation from Kansas to Texas in 1980, he is a man without alternatives.

---

S.Ct. 407, 409, 30 L.Ed.2d 418 (1971). Also, as this Court explained in *Galtieri,* when a state changes the substantive law on the applicable federal issue *after* the highest state court has reviewed a petitioner's habeas corpus application, exhaustion may be excused. 582 F.2d at 355. Finally, if the state's review processes are so "cumbersome, complex and confusing that they frustrate good faith attempts to comply with them," this Court will not require compliance with the exhaustion rule. *Carter,* 677 F.2d at 446-47. *See also Marino,* 332 U.S. at 563-70, 68 S.Ct. at 241-45 (Rutledge, J. concurring) (asserting that Illinois procedural requirements are so thoroughly complicated that exhaustion requirements should be waived).

A thorough review of the records reveals otherwise. Between the postponement of the hearing in September of 1980 and Deters' release on probation in 1984, Deters had two alternatives to move his appeal along. He could have accepted the complete assistance of his court-appointed attorney so that his presence was no longer required at the hearing or he could have exercised his one-time option to return to Texas' jurisdiction.

With respect to the two years during which Deters was paroled, Deters avers that he was unable to go to Texas because of parole restrictions. While this Court recognizes that parolees are limited by certain restrictions, we find Deters' statement incredible. It is simply hard to believe that the parole system prohibited Deters from attending a judicial hearing which directly affected his status as a convict and a parolee. It is even harder to believe that the parole system also prevented Deters from even communicating with the trial court during that time.[17] Finally, though in the physical jurisdiction of Louisiana, Deters has also been in the lawful and valid custody of Texas since January of 1987. Surely Texas would have transported him to the Second Ninth Judicial District Court for the hearing had he but requested.[18]

The inordinate delay exception requires that the delay in state review be *solely* attributable to inadequate state *procedure.* Here, Deters, not Texas procedure, has scotched the wheels of justice. The State, on the other hand, has provided sufficient procedural tools to afford Deters due process: The Court of Criminal Appeals granted Deters an out-of-time appeal, and the Second Ninth Judicial District Court has not dismissed that appeal, even though Deters initiated it almost fourteen years ago. Further, the Court of Criminal Appeals advised Deters to file a petition for a writ of mandamus in that court so as to move his appeal along. Deters rejected that advice. He apparently assumed that the mere passage of time between his 1973 trial and the filing of this habeas corpus application would persuade us that exhaustion is impossible in this case. We are not persuaded.

---

[17]Except for his correspondence with the Court of Criminal Appeals in 1987, Deters has not communicated with the State concerning his state appeal since 1981.

[18]Since Deters is in now Texas' custody, the State can transport him to the state trial court without any hindrances. Problems with transportation apparently occur when prisoners are *not* in the custody of the State.

Indeed, if this Court were convinced that Deters was in a "catch-22" situation, the Court would not hesitate to find that the Texas procedural machine had broken down. However, we do not so find. Having refused to exercise options available to him, Deters cannot successfully argue to this Court that his hands are tied. They are not, and they have not been since 1979 when the Court of Criminal Appeals granted the out-of-time appeal.

Because no Texas appellate court, let alone the Court of Criminal Appeals, has reviewed the merits of Deters' claims, this Court would unduly trample upon the objectives of the exhaustion doctrine to reach the merits of this case. Because Deters' state appeal is still pending, we would have to ignore the doctrine of federal-state comity by disrupting that ongoing state process. More practically, we would have to reach the merits without the aid of a complete record. We therefore hold that Deters' failure to comply with the exhaustion requirement precludes our review of the merits here. This holding in no way denigrates the claims which Deters makes, for he presents serious allegations which clearly merit review. However, we find that at this juncture the federal system is not the proper forum to review those claims.

### III. Conclusion

Section 2254 prohibited the federal district court from granting a writ of habeas corpus in this case. *See* 28 U.S.C. § 2254(b)-(c). Hence, the district court erred in reaching the merits. This Court therefore REMANDS for the district court to dismiss this case without prejudice.